UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-10260-NMG |
| | ) | |
| AARON SWARTZ, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF
THE MASSACHUSETTS INSTITUTE OF TECHNOLOGY'S
MOTION TO INTERVENE AND PARTIALLY OPPOSE
MOTION TO MODIFY PROTECTIVE ORDER**

      The Massachusetts Institute of Technology ("MIT") submits this memorandum of law in support of its motion to intervene and partially oppose the motion of the Estate of Aaron Swartz ("Swartz Estate") to modify the Protective Order entered in this matter.

**Introduction**

      MIT files its response to protect two vital interests—the safety of its employees and other MIT community members and the security of its computer networks. Since Aaron Swartz's death on January 11, 2013, the MIT community has been the subject of threats to personal safety and breaches to its computer network, apparently based on MIT's involvement in the events relating to Mr. Swartz's prosecution. Despite these threats and breaches, MIT values openness, and in fact intends to release a report of its involvement in the Swartz case, along with related documents. Such openness, however, must take into account and address the potential for significant harm to individuals and MIT's network. Therefore, MIT opposes any modification of the Protective Order that does not contain provisions for the redaction of all identifying information of any member of the MIT community as well as redactions to protect any MIT

network vulnerabilities—steps that are necessary to ensure the safety and security of its community.

In order to put the Swartz Estate's motion into proper perspective, MIT believes that it is important to provide some detail on the events that led to the pending motion. As a starting point, between September 2010 and January 2011, MIT responded to reports from JSTOR that someone was using the MIT network to perform an automated download of several million articles from JSTOR's database. MIT acted responsibly to figure out who was using its network to download articles so that it could ensure the security and integrity of its network from unknown intrusions and abide by its contract with JSTOR. In the course of its response to the use of its network and after the arrest of the alleged perpetrator, documents and emails were created. These MIT documents and others were produced to the U.S. Attorney's Office. After Mr. Swartz was indicted, the government produced the MIT documents to his defense counsel pursuant to the Protective Order, which provides (1) that the defense could not use MIT's documents for any purpose other than in the defense of the criminal case, and (2) that such documents were to be destroyed at the end of the criminal case. The criminal case is now over; it was dismissed on January 14, 2013.

Very shortly after Mr. Swartz's death, the President of MIT, L. Rafael Reif, designated MIT Professor Hal Abelson to conduct an internal review of the school's role in the events leading up to and during the government's prosecution of Mr. Swartz, particularly exploring and reviewing MIT's decisions and processes. MIT's President made it clear at the time of the announcement of the independent analysis that, once completed, Professor Abelson's report would be made public. Thus, MIT immediately demonstrated a commitment to reflection and learning through an open process. More recently, on March 19, 2013, President Reif sent a letter

to the entire MIT community in which he reiterated MIT's commitment to an open process and pledged to release MIT documents at the time Professor Abelson's report is made public.  In his letter, President Reif also made it clear that he is very concerned about the privacy and safety of members of the MIT community in the midst of what he described as a "volatile atmosphere."  In order to achieve the goals of openness and protection of MIT personnel, President Reif stated that MIT will release its documents in redacted form – protecting the names and identifying information of its people.  As described in great detail in this Memorandum, MIT's concerns for the safety and privacy of its community members are very real.

MIT has explained these concerns to the staff of the House Oversight and Government Reform Committee (the "House Oversight Committee").  After learning that the House Oversight Committee wanted to review MIT documents, MIT approached the Committee directly to discuss the production of documents.  In a March 21, 2013 meeting, MIT apprised the Committee staff of MIT's interest in protecting the privacy and safety of members of its community and the importance of redacting identifying information of those individuals.   MIT has already begun the process of producing redacted documents, and that production is ongoing.

MIT does not need the Swartz Estate's counsel to act as an intermediary in the process of MIT's production of documents to Congress.  These are, after all, MIT's documents, and the only reason they are in the possession of Keker & Van Nest LLP ("Keker & Van Nest") is because they were produced to the firm in its role as defense counsel in a criminal case, a criminal case that is now over, and pursuant to a Protective Order, an order that required the firm to destroy the documents at the end of the criminal case.  MIT has strong arguments that the Swartz Estate's motion to modify the Protective Order should simply be denied outright, because (1) the criminal case is over and the documents should have been destroyed; (2) the Swartz

Estate lacks standing to appear in the criminal case to which it is not a party; (3) the Swartz

Estate does not, in fact, possess the documents—counsel to Aaron Swartz does and only in its

role as criminal defense attorney; and (4) the documents are MIT's and it alone should be able to

control how and when those documents are disseminated.  Yet, in the spirit of openness, MIT is

not opposed to modifying the Protective Order to permit the dissemination of documents, *so long

as* they are first redacted in a way that protects the identity of members of its community and any

vulnerabilities of its network, redactions that must be made by MIT.

Recent developments have made clear the need for protection of the MIT personnel

involved in the investigation of Mr. Swartz.  On February 23, 2013, the MIT community was in a

state of emergency for several hours when an unidentified caller falsely claimed to the

Cambridge Police Department that a gunman was on campus targeting the MIT President and

other MIT staff in retaliation for Mr. Swartz's death.  In the past two months, MIT also has

endured three separate and severe interruptions to its computer networks, all done expressly in

retaliation for Mr. Swartz's death.  More recently, immediately after President Reif announced

that MIT would release redacted documents at the same time as the publication of Professor

Abelson's report, public comments on the Internet showed why redaction of identifying

information is absolutely necessary: posts stated, for example, "Good, MIT deserves all the

harassment they can get.  They're to blame for his death" and "If the courts will not punish these

killers, the people must."  These events confirm that the publication of MIT's documents in

unredacted form could lead to further, more targeted, and more dangerous threats and attacks.

With the criminal proceedings now concluded, these demonstrable concerns for the privacy and

safety of third parties far outweigh any countervailing interests.

It is for these reasons, and as explained more fully below, that MIT respectfully moves to intervene. Again, MIT does not object to the public release of its documents, if they are properly redacted to protect the privacy and security of its community members. To that end, MIT requests limited relief—that the Court modify the Protective Order to the extent of permitting the parties to make public documents referencing MIT, its staff, or other community members only after MIT first has the opportunity to redact those documents as outlined in this memorandum.

## Background

### *The Grand Jury Subpoenas*

In January 2011 and June 2011, the U.S. Attorney's Office in Boston served grand jury subpoenas on MIT for documents relating to the massive downloading of JSTOR articles between September 2010 and January 6, 2011 from IP addresses that were assigned to MIT. The subpoenaed records included email, notes, correspondence, and other materials relating to the downloading activity. In producing documents, MIT expressly requested and expected that the government treat the documents confidentially. The documents included references to the individual MIT staff who were involved with the initial response to, and an internal investigation of, the alleged downloading that took place on MIT's campus. The documents also included discussions of MIT's security measures with respect to its networks, as well as possible flaws in those systems.

### *The Establishment of the Protective Order and the Underlying Criminal Proceedings*

After Mr. Swartz was charged, the U.S. Attorney's Office determined that the documents which MIT had provided should be produced to the defense pursuant to Fed. R. Crim. P. 16 and

L. R. 116.1 and 116.2 as pre-trial discovery.[1]  Because the MIT Documents contain sensitive

information, the U.S. Attorney's Office took the position that it would not produce the MIT

Documents until a protective order was in place.

     The U.S. Attorney's Office, Mr. Swartz, and his attorney stipulated to the existing

Protective Order as a means of protecting the MIT Documents and others to be produced in

discovery.  The opening paragraph to the Protective Order is instructive:

> Whereas the Indictment in this case alleges that JSTOR and the Massachusetts
> Institute of Technology ("MIT") are victims of conduct committed by
> Defendant Aaron Swartz, and the materials discoverable in this case under
> Fed. R. Crim. P. 16 and L.R. 116.1-116.2 contain potentially sensitive,
> confidential and proprietary communications, documents, and records
> obtained from JSTOR and MIT, including discussion of the victims'
> computers systems and security measures, The Court finds, without objection,
> good cause for entry of this Protective Order pursuant to Fed. Crim. P. 16(d).

The Protective Order made clear that the only purpose for the discovery of these confidential

documents was to assist Mr. Swartz's attorneys in his defense in this criminal action.[2]  The

Protective Order further stated: "In the event either party believes it necessary to use any such

materials for any other purpose, they may seek leave of Court, in which instance opposing

counsel and victims shall have an opportunity to be heard."  Protective Order at ¶ 3.

     Finally, the Protective Order places obligations on defense counsel with respect to the

documents at the conclusion of this criminal action.  The Protective Order states:

---

[1]  MIT does not know whether all of the documents that it produced to the government were made available
to the defense.  Moreover, MIT produced to the U.S. Attorney's Office certain documents before the first grand jury
subpoena was issued that fall within the scope of the subpoenas.  MIT also produced a limited number of documents
directly to defense counsel pursuant to a Rule 17(c) subpoena with the expectation that those documents were
covered by the Protective Order.  For purposes of this motion, MIT considers all documents produced to the
defendant during the criminal action that identify or relate to MIT personnel (from whatever source) to be "the MIT
Documents."

[2]  "The Government and the defense shall use the opposing party's discovery materials solely and
exclusively to litigate this case (including investigation, pre-trial motions, trial preparation, trial, and appeal), and
not for any other purpose."  Protective Order at ¶ 3.

> At the end of these proceedings, including any potential appeals, the defense shall destroy all copies of discovery materials received and made by it. Defense counsel may keep one copy of all discovery materials for such additional time as they deem necessary to ensure their ability to satisfy all professional obligations to Defendant in this matter.

Protective Order at ¶ 7.  On November 30, 2011, the Court entered the Protective Order upon a finding of "good cause."  With safeguards in place, the U.S. Attorney's Office and MIT produced the MIT Documents to defense counsel.

### The Safety of MIT Community Members

In the months since Mr. Swartz's death, several events have taken place that have caused concern for the safety and security of the MIT community.  Most upsetting, on the morning of February 23, 2013, the Cambridge Police Department received a call from an unidentified individual who stated that there was a person with a "really big gun" and "armor" at MIT's Building 7, the main administration complex located at 77 Massachusetts Avenue in Cambridge. The caller identified the gunman as an MIT staff member and stated that the gunman was going after MIT President Rafael Reif and MIT staff.  The caller indicated that the gunman was retaliating against MIT staff for their involvement in the events surrounding Mr. Swartz's suicide.  In response to the call, a team of six MIT police officers and upwards of twenty-five Cambridge Police Department and Massachusetts State Police officers responded to Building 7. Authorities essentially shut down the main center of the campus while the police conducted room-to-room searches.  It was later determined that the call was a hoax, and that there was no gunman on MIT's campus that morning.  However, it was several hours before an all-clear was issued, and there were real fears for the safety of MIT's staff and students.  *See* Exhibits B & C attached to the Affidavit of Emily J. Grannon ("Grannon Aff.").

Since that time, the MIT campus continues to have reason to be concerned that those who have purportedly taken up Mr. Swartz's cause will commit other acts of retaliation.  In fact, this

level of anxiety has only increased since the time Keker & Van Nest filed its motion to modify

the Protective Order.  On March 19, 2013, MIT's President released a statement outlining MIT's

position as to its documents—that the Institute would make them public but with redactions to

any identifying information as to MIT employees and to any discussions of MIT's network

vulnerabilities.  *See* Exhibit D to the Grannon Aff.  President Reif explained that MIT has to

balance "openness" with a "reasonable concern for privacy and safety."  That position already

has been met with cyber-threats and calls for further harassment.  As illustration, a review of the

online comments to just one article posted by the Huffington Post reporting MIT's

announcement on redactions reveals that unidentified persons very much want the names of third

party individuals involved in the Swartz investigation to be revealed so that they might become

the subjects of further harassment or worse.[3]  Included among the online comments posted

within the first twenty four-hours of the article's release were the following:

- I hope the MIT officials live with that fear for the rest of their lives for what they did.
- If the courts will not punish these killers, the people must.
- Good, MIT deserves all the harassment they can get.  They're to blame for his death.
- [U]ntil they are afraid to leave their residences they won't know how he felt.  But that's a repairable problem.
- May those responsible (and they know who they are) forever be looking over their shoulders and, when not afraid, feel crushing guilt and angst over the destruction they have wrought.
- Maybe the MIT people will now find out what actual criminal activity really is.
- Oh well, they can withhold those names all they want, the anon will have them whenever they feel like it.  It will be fun either way to watch.
- I hope these MIT officials who so desperately wish to remain nameless will endure the same level of threats and harassment that was directed at Mr. Swartz.

---

[3] Although MIT provides this illustrative example of a single collection of relevant comments in response to a single news article, MIT stands prepared to provide the Court with additional public comments that further demonstrate MIT's concerns.  However, MIT has no desire to give any greater attention to these harassing and hurtful web comments than is absolutely necessary for the Court to understand MIT's legitimate fears.

*See* Exemplar Collection of Comments posted to March 19, 2013 Huffington Post Article,

attached as <u>Exhibit</u> F to the Grannon Aff, with relating Article attached as <u>Exhibit</u> E.

MIT also has received direct email threats from individuals purportedly retaliating for

MIT's perceived role in the prosecution of Mr. Swartz.  *See* Sample Emails received by MIT's

News Office, attached as <u>Exhibit</u> H to the Grannon Aff.  These communications range from

accusations that MIT staff members contributed to Mr. Swartz's death to an overt threat to "take

action" against MIT.  *Id.*[4]

### *The Network Security Breaches*

Since Mr. Swartz's death, the MIT community has endured at least three attacks on its

computer network and infrastructure resulting directly from MIT's perceived role in Mr.

Swartz's prosecution and subsequent suicide.  On January 13, 2013, MIT's network was

attacked, cutting off Internet access for campus users for three hours and rendering email and

certain MIT webpages inaccessible externally.  *See* <u>Exhibits</u> I, J & L to the Grannon Aff.  The

"activist" group Anonymous took credit for this network intrusion, which replaced the MIT

homepages with messages regarding Mr. Swartz and his prosecution.  *See* <u>Exhibits</u> I, J & M to

the Grannon Aff.  On January 18, 2013, MIT's email system again was compromised, causing an

outage that lasted for between four and six hours.  *See* <u>Exhibit</u> L to the Grannon Aff.  On January

22, 2013, MIT suffered a third and more severe network intrusion, which redirected all external

attempts to reach the MIT website and other online services to a webpage signed by the attacker.

*See* <u>Exhibits</u> K through M to the Grannon Aff.  This outage also caused external emails to and

from MIT email addresses to be delayed, and in some instances, lost.  *Id.*  Though the mit.edu

_____

[4] Cyber threats and gunman hoaxes have not been the only means of protest to have resulted from Mr.
Swartz's suicide.  For example, on March 9, 2013, three masked protestors arrived at the home U.S. Attorney
Carmen Ortiz with "wanted" posters and a cake with the words "Justice for Aaron."  *See* <u>Exhibit</u> G to the Grannon
Aff.

domain was restored after about an hour, residual problems with MIT webpages continued for 24 to 48 hours.  *Id.*

### The House Oversight and Government Reform Committee

On January 28, 2013, the House Oversight and Government Reform Committee sent a letter to Attorney General Eric Holder regarding the Department of Justice's handling of the Swartz prosecution and its application of the Computer Fraud and Abuse Act ("CFAA") to the evidence uncovered.  *See* <u>Exhibit</u> N to the Grannon Aff.  MIT is engaging directly with the staff of the Committee to respond to the staff's related request for documents from MIT.  MIT has explained to the Committee staff the important interests MIT has in protecting the safety and security of its employees and its networks and the resulting need to redact specifically identifying information of members of the MIT community and information that could expose potential vulnerabilities in MIT's networks.  MIT has produced, and is continuing to produce, documents to the Committee with redactions to protect employee privacy and network security, consistent with these concerns.  *See* Letter from Wilmer Hale to Chairman Darrell Issa and Ranking Member Elijah Cummings, attached as <u>Exhibit</u> O to the Grannon Aff.

<u>**Argument**</u>

**I.      MIT Has the Right to Intervene in this Action to Protect its Interests**

MIT seeks to intervene in this action in order to protect the safety and privacy of its employees and other community members, as well as the security of its computer networks.  Recent events compel MIT to intervene at this juncture to ensure that essential redactions are made to the MIT Documents before they are publicly disseminated.

The MIT Documents contain the names, job titles, departments, telephone numbers, email addresses, business addresses, and other identifying information of many members of the MIT community.  The MIT Documents also reveal the direct and indirect involvement of

specific staff members in MIT's responses both to Mr. Swartz's actions on campus and to the subsequent government investigation and prosecution.  Given the high profile nature of this case, and the recent threats to the MIT community in connection with this matter, there is a serious and legitimate concern that the publication of the MIT Documents in unredacted form will put the safety of MIT's employees in jeopardy.  These individuals have a right to some protection against invasions of their privacy and possible harassment—just because these individuals happen to be employees of MIT does not eliminate their privacy interests.

The MIT Documents also contain candid and confidential discussions of MIT's computer networks, including possible weak spots in and modifications to be made to the security of those systems.  In light of the series of intrusions that have occurred in express retaliation for MIT's perceived connection to Mr. Swartz's death, MIT is concerned that the dissemination of these documents will provide a road map for future, and perhaps more serious, attacks on its networks.

Where the stated purpose of entering the Protective Order was to protect the "potentially sensitive, confidential and proprietary communications, documents and records" the government obtained from MIT and JSTOR, MIT should have the right to be heard in opposition to any modification that would subsequently jeopardize the confidentiality of its documents.  The express language of the Protective Order demonstrates that the Court, the U.S. Attorney's Office, and Mr. Swartz anticipated, and in fact invited, MIT to intervene should any party seek leave of Court to use the documents for any reason beyond litigating the criminal case.  Protective Order at ¶ 3.[5]  It is for this reason that Keker & Van Nest served MIT's counsel with its motion,

---

[5] "The Government and the defense shall use the opposing party's discovery materials solely and exclusively to litigate this case (including investigation, pre-trial motions, trial preparation, trial, and appeal), and not for any other purpose.  In the event either party believes it necessary to use any such materials for any other purpose, they may seek leave of Court, in which instance opposing counsel and victims shall have an opportunity to be heard."  Protective Order at ¶ 3.

thereby offering MIT "an opportunity to seek leave to intervene and be heard."  Motion at 7, n.6.[6]

## II.   The Court Could Refuse to Hear Keker & Van Nest's Motion to Modify the Protective Order

Although MIT is willing to agree to a modification of the Protective Order that would permit the publication of the MIT Documents in redacted form, compelling procedural grounds exist for denying outright Keker & Van Nest's motion to modify the Protective Order.

Keker & Van Nest brings its motion on behalf of the Swartz Estate.  The Swartz Estate was not a party to the criminal case, and therefore it is unclear how it has standing, or any legally cognizable interest, to petition for the modification of the Protective Order concerning others' documents.  Further, the Protective Order makes clear that the government provided the discovery documents to defense counsel exclusively for the purpose of defending Mr. Swartz in the criminal proceedings.  After the case was dismissed, Keker & Van Nest's professional obligations to its client in this criminal matter ended, and the firm no longer required the MIT Documents, or any discovery documents, to prepare the defense case.  At that point, the Protective Order required Keker & Van Nest to destroy the documents.[7]

---

[6] Courts long have permitted third parties to intervene in criminal cases for the limited purpose of protecting their own confidential materials obtained during the proceedings.  *See, e.g.*, *Harrelson v. United States*, 967 F. Supp. 909, 912-13 (W.D. Tex. 1997) (stating basic proposition that third party intervention is permitted in criminal proceedings by entities "seeking leave to intervene to protect privileged or confidential information or documents obtained, or property seized, during a criminal investigation"); *United States v. Louis Trauth Dairy, Inc.*, No. 94-52, 1994 WL 876373, at *3 (S.D. Oh. Dec. 7, 1994) (granting third party company's "motion to intervene for the limited purpose of opposing the disclosure of [its] confidential documents" that it produced to the government in response to grand jury subpoenas).

[7] Paragraph 7 of the Protective Order states: "At the end of these proceedings, including any potential appeals, the defense shall destroy all copies of discovery materials received and made by it."  As a result, even though Keker & Van Nest should have destroyed its copies of the MIT Documents as soon as the Court dismissed all charges against Mr. Swartz on January 14, 2013, Keker & Van Nest takes the position that not only should it be able to keep the documents, but also that the Court should allow the firm to disseminate them to the public.

III.    **MIT Nevertheless Agrees to Allow its Documents to be Disseminated on the Condition that they be Appropriately Redacted**

Despite the fact that the Court could refuse outright to grant Keker & Van Nest's motion to modify the Protective Order, in the interests of openness, MIT would agree to modification of the Protective Order to allow for the dissemination of its documents *so long as* the documents are first redacted.[8]  The public dissemination of the MIT Documents must be balanced against the legitimate concerns for the safety of third parties and the security of MIT's computer network. This balancing of interests requires that the MIT Documents be published only if they are redacted to eliminate any identifying information of MIT staff or other community members or discussions of MIT's network vulnerabilities.  The public interest in what would be redacted from the MIT Documents is minimal, while the interest in protecting the privacy and safety of the individuals named in the documents is much greater than it was at the time of the entry of the Protective Order.

In its motion, Keker & Van Nest gets this balance completely wrong.  Keker & Van Nest states that the death of Mr. Swartz has "led to an increase in public interest in both the details of the investigation and prosecution and the reasonableness of prosecutions under the CFAA generally."  Motion at 6.  Although Congress or the public might be interested in any role MIT might have played in the decisions of the prosecutor, only MIT's role as an institution would be

---

[8]   Modifying or lifting an existing protective order requires "a significant change of circumstances calling into question the necessity of the protective order."  *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 790-91 (1st Cir. 1988) (requiring a "relevant change in circumstances" such that "the reasons underlying the initial promulgation of the order in respect to the particular document sought no longer exist"); *see also United States v. DiMasi*, No. 09-10166, 2011 WL 915349, at *4 (D. Mass. Mar. 16, 2011) (finding no change in circumstances justifying a modification of a protective order necessary to protect, among other things, the privacy interests of third parties). Nothing has changed that alters the undeniable fact that the MIT Documents contain information that, if published, could cause damage to third party individuals and MIT.  Moreover, there are no "changed circumstances" or new situations that would serve as the bases for publishing the names of MIT staff members involved in the Swartz investigation.  In fact, the relevant changes in circumstances, including the public outcry and vitriol over the prosecution of Mr. Swartz since his death, only reinforce the need to protect the MIT community.

relevant; knowing which individual members of the MIT community might have been involved in some action or email is not relevant.  The identification of MIT personnel is not "vital information" to the issues of the public debate into "understand[ing] how the investigation and prosecution of Mr. Swartz proceeded."  Motion at 6-7.  Although *what* MIT staff said might be relevant, *who* said it is certainly not—their identities have little to do with reviewing the actions of the U.S. Attorney's Office.

Balanced against this minimal public interest in the redacted information are the very real concerns for the security and privacy of the MIT community.[9]  As a result of Mr. Swartz's suicide, MIT and its community have been the subjects of retaliatory threats, hoaxes, and cyber-attacks that may continue and become more severe should the documents be disclosed in unredacted form.  Given what has unfolded, Keker & Van Nest is plainly mistaken in characterizing MIT's concerns as "minimal."  Motion at 6.

Where there are legitimate fears for the privacy and security of third parties, courts often order the redaction of identifying or confidential information before disclosure or dissemination. *See, e.g.*, *United States v. Kravetz*, 706 F.3d 47, 61-63 (1st Cir 2013) (noting that redaction is an appropriate tool to balance any public desire for access with the protection of privacy rights of third parties); *DiMasi*, 2011 WL 915349, at *2 (ordering redactions of names and other

---

[9] The privacy and safety of these third party individuals must weigh heavily in any decision concerning the MIT Documents.  *See DiMasi*, 2011 WL 915349, at *4 (holding there was good cause to justify continuation of a protective order covering discovery documents in part to protect the privacy interests of third parties in a heavily publicized proceeding); *United States v. Salemme*, 985 F. Supp. 193, 197 (D. Mass. 1997) ("The privacy interests of third parties may weigh heavily in deciding issues of impoundment."); *see also United States v. Kravetz*, 706 F.3d 47, 61-62 (1st Cir. 2013) (noting the need to protect even judicial documents that would intrude upon the privacy rights of third parties).  The legitimate fear that third parties will suffer harassment and threats renders their privacy of even greater importance.  *See United States v. Bulger*, 283 F.R.D. 49, 55-56 (D. Mass. 2012) (citing Fed. R. Crim. P. 16(d), Advisory Committee Notes to the 1974 Amendments (recognizing the "'obvious' appropriateness of a protective order 'where there is reason to believe that a witness would be subject to physical or economic harm if his identity is revealed'")).  This is particularly so where, as here, a case has generated intensive media coverage and public attention.

information in an affidavit filed with the court before it was released in order to protect the privacy interests of third parties who testified before the grand jury).  The court's decision in *United States v. Bulger* is instructive.  In that case, the defendant argued that a blanket protective order, covering an estimated 300,000 produced documents, excessively burdened his preparation for trial and sought to lift the order.  283 F.R.D. 49, 55 (D. Mass. 2012).  Noting the importance of protecting the privacy and safety of witnesses, the victim's families, and confidential informants—especially where individuals had been targeted before—the court required government approval, and redaction where necessary, before the defendant could make public any particular document regarding these third parties.  *Id.* at 55-57.  Here, where the criminal case is over, it is indisputable that any opposing interest favoring disclosure is less compelling than in *Bulger*.  But, as in *Bulger*, the heightened media scrutiny, along with the succession of attacks and threats to MIT's real and virtual communities, makes it necessary to protect the safety of members of the MIT community and the integrity of MIT's networks by redacting the sensitive information.[10]

At bottom, the safety and security concerns of third parties far outweigh any purported interest in making public the redacted information, the identities of the individuals involved

---

[10] When MIT provided its documents in the grand jury setting, it requested that the government afford the documents with protections necessary to secure the information contained therein.  For the rug to be pulled out from under MIT after the conclusion of all criminal proceedings would be fundamentally unfair.  Moreover, if protective orders were subject to ready modification after the close of a criminal matter, the result would be an inevitable chilling effect on the U.S. Attorney's Office's open participation in discovery.  As the First Circuit has stated, "the lubricating effects of the protective order on pre-trial discovery would be lost if the order expired at the end of the case or were subject to ready alteration."  *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993).  The U.S. Attorney's Office and MIT provided the MIT Documents in discovery only with the understanding that these materials would go no further than defense counsel, and that if used at trial, would be subject to judicial supervision.  With the criminal proceedings now over, it would be quite a reversal if defense counsel were permitted to disseminate those same documents to the world at large.

having little or no relevance to the alleged public interest of reviewing the actions of the U.S. Attorney's Office.

> **A.      The MIT Documents contain sensitive information concerning the involvement of third party individuals in the Swartz investigation.**

The MIT Documents include emails and documents authored by, received by, or referencing MIT staff and other MIT community members.  These emails detail the participation of these individuals in the discovery of Mr. Swartz's activities on campus as well as in MIT's response to government inquiries during the prosecution.  The release of individual names and other identifying information will put at risk the privacy and safety of these individuals.

In light of the substantial attention that Mr. Swartz's suicide has triggered, the safety and privacy of MIT staff and other community members unquestionably weighs against the publication of their names and roles in the investigation.  If the past is any indicator, the named individuals could become the subjects of threats and harassment should the details of their specific involvement be disclosed.  Several groups have exhibited an indifference to privacy and safety by attacking, by way of network intrusions or threats, those individuals they feel contributed to Mr. Swartz's death.  The fact that these groups are unidentifiable and so passionate about Mr. Swartz's death must play a key role in the Court's assessment of the pending motion.  The death of Mr. Swartz has created a very volatile atmosphere.

In fact, the recent web reaction to MIT's pledge to release redacted documents illustrates the validity of the concerns for the security of MIT employees should their specific involvement be disclosed.  Unnamed bloggers have posted their hopes that MIT staff "forever be looking over their shoulders," be "afraid to leave their residences," and "find out what actual criminal activity really is."  *See* Exhibit F to the Grannon Aff.  Moreover, where these anonymous bloggers also

16

hope that "these MIT officials who so desperately wish to remain nameless will endure the same level of threats and harassment that was directed at Mr. Swartz," there has to be a significant concern for the safety and privacy of the members of the MIT community if their names and roles in MIT's response were made public.  *Id.*  One poster encapsulated MIT's concerns with the following threat: "If the courts will not punish these killers, the people must." *Id.*[11]

Balanced against these substantial privacy and safety concerns, the release of any information concerning these individuals provides little value to the general public, which has no legitimate interest in seeing the names of the specific individuals at MIT who, as part of their jobs, became involved in MIT's efforts to stop the downloading on campus and to respond to the U.S. Attorney's Office's requests for information.  Although there may be a public interest in the role of MIT as an entity, the release of the names of individuals on emails is completely unnecessary.

### B.    The MIT Documents contain sensitive information concerning MIT's network security vulnerabilities.

Since Mr. Swartz's death, MIT has been the subject of several attacks on its campus network, all done in express retaliation for what the attackers view as MIT's role in the prosecution of Mr. Swartz.  These attacks have led to lengthy network shutdowns, lost emails, and rewritten web pages.  The disruptions have caused substantial inconvenience to the entire

---

[11] Keker & Van Nest cites *Anderson v. Cryovac*, 805 F.2d 1, 7 (1st Cir. 1986) and *United States v. Wecht*, 484 F.3d 194, 211 (3d Cir. 2007) for the proposition that "to find good cause for continuation of a protective order, there must be a particularized, specific showing of [potential]  harm."  Motion at 9.  Far from "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning," MIT can point to several threats, hoaxes, and intrusions as "clearly defined and serious injur[ies]" with the requisite "specificity" required to maintain a protective order.  *Wecht*, 484 F.3d at 211.  In *Cryovac*, the court affirmed the district court's issuance of a protective order where the court was concerned that extensive publicity surrounding the case would inhibit or prevent the selection of an impartial jury.  805 F.2d at 8.  Because the district court had been faced with "specific instances of massive and potentially harmful publicity," the First Circuit found there had been good cause to issue the order.  *Id.*  Likewise, confronted with specific instances of animosity and vitriol towards the MIT community for its perceived role in Mr. Swartz's death, this Court must maintain the privacy of MIT employees as intended by the original Protective Order.

MIT community and have forced MIT to expend significant resources in response.  Any release of documents that discuss the vulnerabilities of MIT's network security measures unquestionably will facilitate further interference with its networks.

Meanwhile, where the House Oversight Committee's inquiry focuses on prosecutorial conduct and the computer fraud statute, the release of information concerning MIT's network security concerns would have no tangible value.

### C.       Keker & Van Nest Raises No Interests That Outweigh the Need for Redaction

Keker & Van Nest argues that the redactions of names and identifying information somehow will hinder the House Oversight Committee in examining the U.S. Attorney's Office's prosecutorial decisions.  As stated above, MIT is now in direct contact with the Committee and is in the process of producing documents in response to the Committee staff's requests, with identifying information of individuals redacted.  *See* Exhibit O to the Grannon Aff.  MIT will continue to engage directly with the House Oversight Committee; Keker & Van Nest is an unnecessary intermediary.

Keker & Van Nest argues redactions are unnecessary because Mr. Swartz's prior counsel filed motion to suppress papers in October 2012 that included references to a few of the MIT Documents and MIT staff members in question.  Defense counsel should have redacted those references to confidential materials in the publicly available versions of the briefs.  Nevertheless, Keker & Van Nest should not be allowed to exploit the wrongful disclosure previously made by defense counsel by now publishing all of the MIT documents, whether previously referenced or not.  Meanwhile, defense counsel did properly file under seal the few underlying MIT documents, meaning that only generalized references and a few, selective quotes were made publicly available.  This limited disclosure does not justify the public dissemination of a set of

hundreds of unredacted documents that necessarily will magnify the safety and privacy concerns of the individuals mentioned.

Moreover, it is important to note that at the time that Mr. Swartz's counsel filed the unredacted versions of their briefs, which obviously pre-dated Mr. Swartz's death, there was not the charged atmosphere surrounding the prosecution that exists today.  A substantially greater exposure of information and a disclosure of the underlying documents in unredacted form would be particularly harmful where the documents would provide those that might do harm to MIT with the exact context of each individual's involvement.

Finally, Keker & Van Nest's invocation of the public's right of access is misplaced.  Discovery documents, including Rule 17(c) materials, that do not play a role in the rendering of a judicial decision do not give rise to any First Amendment or common law public right of access.  *See Kravetz*, 706 F.3d at 55-56 ("[N]o presumptive right of public access, based either in the common law or the First Amendment, attaches to the Rule 17(c) subpoenas or the related documents filed in connection with the underlying criminal prosecution."); *see also Poliquin*, 989 F.2d at 533 (discovery is a "presumptively private phase of litigation"); *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995) (documents simply "passed between the parties in discovery" receive no presumption of access).  Therefore, there is no presumption of access to the MIT Documents, which were produced in the grand jury setting and produced to Keker & Van Nest in discovery, meaning that they are subject to disclosure only upon a demonstration of "special need."  *Kravetz*, 706 F.3d at 56. [12]  Where MIT already is making redacted documents

---

[12] Even as to the handful of the MIT Documents that defense counsel filed with the Court under seal in connection with its motions to suppress, the Court did not issue any ruling on those motions before the charges were dismissed, and thus those documents are not "judicial documents" subject to any public right of access.  However, even if they were subject to a right of access, the countervailing considerations of third party safety and security would outweigh any public interest in the release of the individual names and roles of MIT personnel.

publicly available, the Swartz Estate cannot demonstrate a special need for the redacted information.

## Conclusion

For the foregoing reasons, MIT should be permitted to intervene in this action and Keker & Van Nest's motion to modify the Protective Order should be allowed with respect to the MIT Documents only to the extent that a set of the documents as redacted by MIT be made available for release. To that end, the Court should order Keker & Van Nest to return the originals and all copies of the MIT Documents so that MIT can make redactions to remove (a) any identifying information as to specific individuals, including but not limited to their names, titles and departments, and (b) any discussions of any MIT network security vulnerabilities. The redacted version of the MIT Documents can then be made publicly available.

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY

By its attorneys,

  /s/ Jonathan L. Kotlier
Jonathan L. Kotlier (BBO# 545491)
jkotlier@nutter.com
Christopher H. Lindstrom (BBO# 657430)
clindstrom@nutter.com
Emily J. Grannon (BBO# 682267)
egrannon@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone:  (617) 439-2000
Dated:  March 29, 2013            Facsimile:  (617) 310-9000

## CERTIFICATE OF SERVICE

I certify that, on March 29, 2013, this document (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/  Jonathan L. Kotlier

2182537.14